Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Block]

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

CHRISTY HERTEL, derivatively on behalf of RYVYL INC. f/k/a GREENBOX POS,

  Plaintiff,

  v.

BEN ERREZ, FREDI NISAN, J. DREW BYELICK, BENJAMIN CHUNG, GENEVIEVE BAER, WILLIAM CARAGOL, EZRA LANIADO, and DENNIS JAMES

  Defendants,

  and

RYVYL, INC.,

  Nominal Defendant.

Case No.: '23CV1165 L    BLM

**DEMAND FOR JURY TRIAL**

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## INTRODUCTION

Plaintiff Christy Hertel  ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant RYVYL Inc. f/k/a GreenBox POS ("RYVYL" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Ben Errez ("Errez"), Fredi Nisan ("Nisan"), J. Drew Byelick ("Byelick"), Benjamin Chung ("Chung"), Genevieve Baer ("Baer"), William Caragol ("Caragol"), Ezra Laniado ("Laniado"), and Dennis James ("James") (collectively, the "Individual Defendants," and together with RYVYL, the "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors and/or officers of RYVYL, unjust enrichment, waste of corporate assets, abuse of control, gross mismanagement, violations of Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 11(f) of the Securities Act of 1933 (the "Securities Act") and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon Plaintiff's own knowledge and own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding RYVYL, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by RYVYL's directors and officers from January 29, 2021 through January 20, 2023 (the "Relevant Period").

2.      RYVYL, formerly known as GreenBox POS ("GreenBox"), is a financial technology company centered on disrupting the payments industry by offering multiple blockchain encoded

payment processing solutions for individuals and businesses. RYVYL is a Nevada corporation based in San Diego, California.

3.     The Company provides a variety of financial services such as payment processing, banking-like services, and a stablecoin platform dubbed "coyni" which purports to provide real time ability to cash out funds at any time.

4.     The Company was incorporated in Nevada on April 10, 2007 as ASAP Expo, Inc. On April 12, 2018, ASAP Expo, Inc. acquired GreenBox's blockchain gateway and payment system business, among other things. Subsequently, ASAP Expo, Inc. changed its name to GreenBox on May 3, 2018. On January 4, 2020, ASAP Expo, Inc. and GreenBox entered into an asset purchase agreement to memorialize a verbal agreement entered into on April 12, 2018.

5.     On January 29, 2021, RYVYL filed a registration statement with the SEC on Form S-1, which, in combination with a February 10, 2021 amendment on Form S-1/A (declared effective on February 12, 2021 and filed pursuant to Rule 424(b)(4)), was issued in connection with the Company's January 29, 2021 initial public offering (the "Offering") (collectively, the "Registration Statement").

6.      On February 18, 2021, the Company filed its final prospectus (the "Prospectus") on Form 424B4 in connection with the Offering, which forms part of the Registration Statement. Defendants Nisan and Errez signed or authorized the signing of the Registration Statement.

7.     The Company initiated the Offering on February 17, 2021, trading shares of its common stock on the NASDAQ under the ticker symbol "RVYL." Through the Offering, the Company sold 4,150,000 shares of Company common stock at a price of $10.50 per share. On October 13, 2022, GreenBox changed its name to RYVYL.

8.     Throughout the Relevant Period, Defendants failed to implement adequate internal controls that would prevent false and misleading financial information from being published by the Company in its public disclosures and SEC filings. In particular, Defendants failed to disclose adverse

information regarding the Company's business prospects and operations. These inadequate internal controls resulted in the Company's failure to comply with SEC rules and regulations and eventually forced the Company to restate several financial statements filed with the SEC.

9.      Despite becoming aware of the Company's inadequate internal controls when the Offering commenced, Defendants concealed this reality from investors and the overall public for months and failed to take timely mitigative action, instead making a series of false and misleading statements touting the health of the Company and suggesting that the only routine internal controls challenges the Company was facing stemmed from the reporting requirements of a public company. Defendants did not disclose the severity of the internal controls issue to investors or to the public until January 20, 2023, when the Company revealed in a Form 8-K filed with the SEC that several of its previously filed financial statements should no longer be relied upon.

10.      On this news, the Company's stock fell $0.12 per share, or 14.63%, from closing at $0.82 per share on January 20, 2023 to close at $0.70 per share on January 23, 2023 on unusually heavy trading volume.

11.      On December 5, 2022, RYVYL received a deficiency letter from the Listing Qualifications Department of NASDAQ that notified the Company that, due to the substandard stock price of the Company's common stock (which was consistently trading for less than $1.00 per share) for the 30 days preceding the letter, RYVYL was not in compliance with the NASDAQ listing requirements. Accordingly, NASDAQ provided RYVYL with 180 additional days to regain compliance.

12.      On June 7, 2023, the Listing Qualifications Department of NASDAQ notified RYVYL that the Company failed to maintain a minimum bid price of $1.00 per share during the 180-day grace period. Additionally, NASDAQ stated that RYVYL was not eligible for a second 180-day compliance grace period as the Company did not comply with the minimum $5,000,000 stockholder's equity requirements for initial listing on NASDAQ. Therefore, RYVYL's common stock could be delisted

from NASDAQ soon, pending the Company's submission to the NASDAQ Hearings Panel of a plan to regain compliance with these listing requirements.

13.     Moreover, during the Relevant Period, Defendants Errez and Nisan, controlling shareholders of the Company who also served on the Company's Board during the Relevant Period, pushed through two related party transactions which directly benefitted each of them at the expense of the Company. Specifically, the related party transactions involved RYVYL repurchasing two million shares of common stock from GreenBox POS LLC ("PrivCo"), a company owned and controlled by Defendants Errez and Nisan, in two separate repurchases at artificially inflated prices of $5.59 and $0.82 per share, respectively, during the Relevant Period.

14.     The board "unanimously ratified" the two transactions between RYVYL and PrivCo in October 2022. The first transaction (the "First Transaction") involved the Company repurchasing one million shares for a price per share of $5.59, which was the price of the Company's stock on November 24, 2021, almost one year before the Board ratified the First Transaction. The First Transaction took place over multiple months, from February 2022 to October 2022. However, by the time the Board "unanimously ratified" the First Transaction in October 2022, RYVYL's common stock was consistently trading for less than one dollar per share. Thus, in total, the Company paid $5,590,000 to repurchase 1,000,000 shares of its common stock at an average price of $5.59 per share through the First Transaction. As the Company's stock price was actually only worth $0.70 per share, the price at the close of trading on January 23, 2023, the Company should have paid only $700,000 to repurchase its common stock and, thus, overpaid by approximately $4,890,000 to repurchase its common stock in the First Transaction.

15.     The second transaction (the "Second Transaction") involved the Company repurchasing another one million shares for a price per share of $0.82, which was the price of the Company's stock on July 29, 2022, almost three months before the Board ratified the Second Transaction. The Second

Transaction took place in October 2022. Thus, in total, the Company paid $820,000 to repurchase 1,000,000 shares of its common stock at an average price of $0.82 per share through the Second Transaction. As the Company's stock price was actually only worth $0.70 per share, the price at the close of trading on January 23, 2023, the Company should have paid only $700,000 to repurchase its common stock and, thus, overpaid by approximately $120,000 to repurchase its common stock in the Second Transaction.

16.     In total, from the First Transaction and the Second Transaction (collectively, the "Overpayment Misconduct"), the Individual Defendants caused RYVYL to spend $6,410,000 to repurchase 2,000,000 shares of its its own stock from Defendants and controlling shareholders Errez and Nisan at the Company's expense during the Relevant Period. Through the Overpayment Misconduct, the Company overpaid (and Defendants Errez and Nisan, consequently, were unjustly enriched) by approximately $5,010,000 for repurchases of Company common stock during the Relevant Period.

17.     The Overpayment Misconduct caused issues for the Company internally. Indeed, soon after the conclusion of the Relevant Period, on April 12, 2023, Defendants Caragol and James, along with non-party director Adele Hogan ("Hogan") resigned from the Board effective immediately due to "a disagreement with the Company, known to Messrs. Errez and Nisan, involving the PrivCo related party transaction."

18.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) RYVYL's Offering was solicited on false and misleading information; (2) RYVYL did not design sufficient controls to identify and report proper revenue and assets; (3) the Company did not design and

implement sufficient internal controls procedures; (4) RYVYL played down the adequacy of the Company's internal controls; (5) as a result, RYVYL would have to restate certain financial statements; and (6) RYVYL failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

19.     The Individual Defendants further breached their fiduciary duties by causing RYVYL to repurchase its own stock at artificially inflated rates. Indeed, separate and apart from the Overpayment Misconduct, between May 2021 and December 2022, the Individual Defendants caused the Company to repurchase approximately 1,098,586 million shares of RYVYL common stock at artificially inflated prices, costing the Company approximately $7.9 million. Since the repurchased stock was only worth $0.70 per share, which was the price at close of trading on January 23, 2023, RYVYL overpaid by over $7.1 million.

20.     Thus, in total, during the Relevant Period, the Individual Defendants caused the Company to repurchase over 3,000,000 shares of Company common stock at an aggregate total price of over $14 million (~$6.4 million of which was paid to PrivCo pursuant to the Overpayment Misconduct), thereby causing the Company to overpay by $12.1 million for repurchases of its common stock during the Relevant Period.

21.     Moreover, two of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales of Company common stock at artificially inflated prices, obtaining collective proceeds of over $388,000.

22.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

23.     In light of the Individual Defendants' misconduct—which has subjected RYVYL, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), its former CFO, and two current members of its Board of Directors (the "Board") to a federal securities fraud class action lawsuit

pending in the United States District Court for the Southern District of California (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

24. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

25. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the CEO's, CFO's, and two Board members' liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of RYVYL's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

27.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act and the Exchange Act.

28.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

29.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

30.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

31.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of California or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

32.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, Defendants have conducted business in this District, Defendants' actions have had an effect in this District, and RYVYL is headquartered in this District.

## PARTIES

### Plaintiff

33.     Plaintiff is a current shareholder of RYVYL common stock. Plaintiff has continuously held RYVYL common stock at all relevant times. Plaintiff is a citizen of Virginia.

### Nominal Defendant RYVYL

34.     RYVYL is a Nevada corporation with its principal executive offices at 3131 Camino Del Rio North, Suite 1400, San Diego, California 92108. RYVYL's shares trade on NASDAQ under the ticker symbol "RVYL."

**Defendant Errez**

35.     Defendant Errez is a co-founder of the Company and has served as the Company's Chairman of the Board, Executive Vice President, Principal Financial Officer, and Principal Accounting Officer since July 2017. According to the Company's Schedule 14A filed with the SEC on August 31, 2022 (the "2022 Proxy Statement"), as of August 16, 2022, Defendant Errez beneficially owned 10,065,390 shares of the Company's common stock, representing 42.33% of the Company's outstanding shares, thus making Defendant Errez a controlling shareholder of the Company. Given that the price per share of the Company's common stock at the close of trading on August 16, 2022 was $1.97, Defendant Errez owned approximately $19.8 million worth of RYVYL stock. Defendant Errez, along with Defendant Nisan, owns his shares of Company common stock through GreenBox POS LLC, which is defined as "PrivCo" in RYVYL's public filings with the SEC.

36.     For the fiscal year ended December 31, 2022 ("Fiscal Year 2022"), Defendant Errez received $366,698 in total compensation from the Company. This included $201,539 in salary, $48,000 in bonuses, $36,663 in stock awards, $29,953 in option awards, and $80,496 in all other compensation. For the fiscal year ended December 31, 2021 ("Fiscal Year 2021"), Defendant Errez received $381,710 in total compensation from the Company. This included $201,545 in salary, $52,500 in bonuses, $12,708 in stock awards, $40,009 in option awards, and $114,953 in all other compensation.

37.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Errez made the following sale of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| February 12, 2021 | 192,000 | $1.30 | $249,600 |

Thus, in total, before the fraud was exposed, he sold 192,000 shares of Company common stock on inside information, for which he received approximately $249,600 in proceeds. His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

38.     The Company's 2022 Proxy Statement stated the following about Defendant Errez:

***Ben Errez*** has acted as Chairman of our Board of Directors (the "Board"), Executive Vice President, Principal Financial Officer and Principal Accounting Officer since July 2017. He has brought this expertise to the Company to lead the Company into the forefront of the blockchain-based financial software, services and hardware market. Since 2017, Errez has been a principal of the GreenBox Business. From August 2004 until August 2015, Errez formed the start-up IHC Capital, where he held the position of Principal Consultant from founding to the present date, through which he advises clients in the South Pacific region with market capitalizations ranging from $50M to $150M on matters such as commerce, security, reliability and privacy. From January 1991 to August 2004, he served as Software Development Lead for the Microsoft International Product Group. He led the International Microsoft Office Components team (Word, Excel, PowerPoint) in design, engineering, development and successful deployment. He also served as Executive Representative of Microsoft Office and was a founding member of the Microsoft Trustworthy Computing Forum, both within the company, and internationally. Errez co-authored the first Microsoft Trustworthy Computing Paper on Reliability. At Microsoft, Mr. Errez was responsible for the development of the first Microsoft software translation Software Development Kit ("SDK") in Hebrew, Arabic, Thai and Simplified Chinese, as well as the development of the first bidirectional extensions to Rich Text Format ("RTF") file format, all bidirectional extensions in text converters for Microsoft Office, and contributed to the development of the international extensions to the Unicode standard to include bidirectional requirements under the World Wide Web Consortium ("W3C"). He received his Bachelor Degree in Mathematics and Computer Science from the Hebrew University.

39.     Upon information and belief, Defendant Errez is a citizen of California.

**Defendant Nisan**

40.     Defendant Nisan is a co-founder of the Company and has served as the Company's CEO and as a Company director since July 2017. According to the 2022 Proxy Statement, as of August 16, 2022, Defendant Nisan beneficially owned 10,314,381 shares of the Company's common stock, representing 45.72% of the Company's outstanding shares, thus making Defendant Nisan a controlling shareholder of the Company. Given that the price per share of the Company's common stock at the close

of trading on August 16, 2022 was $1.97, Defendant Nisan owned approximately $20.3 million worth of RYVYL stock. Defendant Nisan, along with Defendant Errez, owns his shares of Company common stock through PrivCo.

41.    For Fiscal Year 2022, Defendant Nisan received $361,017 in total compensation from the Company. This included $201,539 in salary, $48,000 in bonuses, $36,663 in stock awards, $29,953 in option awards, and $74,816 in all other compensation. For Fiscal Year 2021, Defendant Nisan received $346,357 in total compensation from the Company. This included $202,959 in salary, $20,000 in bonuses, $12,708 in stock awards, $40,009 in option awards, and $104,686 in all other compensation.

42.    The 2022 Proxy Statement stated the following about Defendant Nisan:

*Fredi Nisan* has served as a Director and our Chief Executive Office since July 2017, and has been a principal of the Company since August 2017. In May 2016, Nisan founded Firmness, LLC. Through Firmness, Nisan created ("QuickCitizen," a software program that simplfies the onboarding process for new clients of law firms specializing in immigration issues. The QuickCitizen software significantly reduced law firm's onboarding processing time from more than three hours to approximately fifteen minutes. In January 2010, Nisan launched Brava POS, where he served as President until 2015. Brava POS provided point of sale ("POS") systems for specialty retail companies. Nisan developed software to provide clients with solutions for issues ranging from inventory management to payroll to processing high volume transactions in the form of a cloud-based POS system. This system had the capability to manage multiple stores with centralized inventory and process sales without an internet connection, and offered a secure login for each employee, as well as including advanced inventory management and reporting, plus powerful functionality for its end users.

43.    Upon information and belief, Defendant Nisan is a citizen of California.

**Defendant Byelick**

44.    Defendant Byelick served as CFO of the Company from August 16, 2022 until he resigned on March 2, 2023. Prior to serving as CFO, he served as the Company's Senior Vice President of Finance from June 2022 to August 2022. According to the 2022 Proxy Statement, Defendant Byelick receives an annual base salary of $275,000 from the Company.

45.    The 2022 Proxy Statement stated the following about Defendant Byelick:

***Drew Byelick*** has served as Chief Financial Officer since August 2022. From June 2022 to August 2022, Mr. Byelick served as Senior Vice President of Finance of the Company. Prior to joining GreenBox, Mr. Byelick served as Chief Financial Officer of Aero Compenents, LLC, a manufacturer of structural aircraft parts for DOD and other U.S. OEMs. From 2015 to 2019, Mr. Byelick help multiple roles at AZZ Inc., a $1 billion global provider of metal coatings, welding services, and engineered electrical equipment serving a broad scope of industries and applications. Mr. Byelick's last position at AZZ Inc. was Vice President, Chief Accounting Officer. Mr. Byelick has a BS in Accounting from Lehigh University and an MBA from Fordham University and is a licensed CPA.

46.     Upon information and belief, Defendant Byelick is a citizen of California.

**Defendant Chung**

47.     Defendant Chung served as CFO of the Company from May 2021 to August 16, 2022.

48.     For Fiscal Year 2021, Defendant Chung received $709,294 in total compensation from the Company. This included $213,333 in salary, $495,000 in stock awards, and $961 in all other compensation.

49.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Chung made the following sale of Company stock:

| Date | Shares Sold | Avg. Price Per Share | Proceeds |
|---|---|---|---|
| February 3, 2022 | 40,000 | $3.46 | $138,400 |

Thus, in total, before the fraud was exposed, he sold 40,000 shares of Company common stock on inside information, for which he received approximately $138,400 in proceeds. His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

50.     Upon information and belief, Defendant Chung is a citizen of California.

**Defendant Baer**

51.     Defendant Baer has served as a Company director since February 12, 2021. She also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of August 16, 2022, Defendant Baer beneficially

owned 16,287 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 16, 2022 was $1.97, Defendant Baer owned approximately $32,085 worth of RYVYL stock.

52.     For Fiscal Year 2022, Defendant Baer received $53,497 in total compensation from the Company. This included $35,833 in fees earned or paid in cash and $17,664 in stock awards. For Fiscal Year 2021, Defendant Baer received approximately $60,000 in total compensation from the Company. This included $2,500 per month in salary and $2,500 per month in stock awards, pursuant to the BOD Agreements.

53.     The Company's 2022 Proxy Statement stated the following about Defendant Baer:

> ***Genevieve Baer*** has served as a Director since February 2021 and has been chief executive officer of JKH Consulting since 2009. JKH Consulting is a real estate finance consulting firm that has advised on transactions with a collective value of over $10 billion. Prior to her work with JKH Consulting, Ms. Baer worked at Magnet Industrial Bank for 6 years at the end of which tenure she was a Senior Vice President. Ms. Baer also worked at US Bancorp Piper Jaffray for 9 years as a Vice President working on equity and debt real estate financings. Ms. Baer earned a B.S. in chemistry from the University of Utah.

54.     Upon information and belief, Defendant Baer is a citizen of California.

**Defendant Caragol**

55.     Defendant Caragol served as a Company director from February 12, 2021 until he resigned on April 12, 2023. Prior to his resignation, he served as the chair of the Compensation Committee, the chair of the Audit Committee, and as the chair of the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of August 16, 2022, Defendant Caragol beneficially owned 32,161 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 16, 2022 was $1.97, Defendant Caragol owned approximately $63,357 worth of RYVYL stock.

56.     For Fiscal Year 2022, Defendant Caragol received $101,921 in total compensation from the Company. This included $69,315 in fees earned or paid in cash and $32,607 in stock awards. For

13

Fiscal Year 2021, Defendant Caragol received approximately $120,000 in total compensation from the Company. This included $5,000 per month in salary and $5,000 per month in stock awards, pursuant to the BOD Agreements.

57.     The Company's 2022 Proxy Statement stated the following about Defendant Caragol:

**William J. Caragol** is the Chief Financial Officer of Mainz Biomed, N.V. (NASDAQ: MYNZ) since July of 2021. From 2018 to the present, Mr. Caragol has also been Managing Director of Quidem LLC, a corporate advisory firm. Since 2015, Mr. Caragol has been Chairman of the Board of Thermomedics, Inc., a medical diagnostic equipment company. Mr. Caragol, since February 2021, is also on the Board of Directors and is Chairman of the Audit Committee of Greenbox POS (NASDAQ: GBOX) and from 2012 to 2018, and since July 2021 is on the Board of Directors of Worksport Ltd. (Nasdaq: WKSP), an emerging company in the electric vehicle and alternative energy sector. From 2012 to 2018. Mr. Caragol was Chairman and CEO of PositiveID, a holding company that was publicly traded that had a portfolio of products in the fields of bio-detection systems, molecular diagnostics, and diabetes management products. Mr. Caragol earned a B.S. in business administration and accounting from Washington & Lee University and is a member of the American Institute of Certified Public Accountants.

58.     Upon information and belief, Defendant Caragol is a citizen of Germany.

**Defendant James**

59.     Defendant James served as a Company director from May 4, 2021 until he resigned on April 12, 2023. Prior to his resignation, he served as a member of the Audit Committee and as a member of the Compensation Committee.

60.     For Fiscal Year 2022, Defendant James received $53,660 in total compensation from the Company. This included $35,997 in fees earned or paid in cash and $17,664 in stock awards. For Fiscal Year 2021, Defendant James received approximately $60,000 in total compensation from the Company. This included $2,500 per month in salary and $2,500 per month in stock awards, pursuant to the BOD Agreements.

61.     The Company's 2022 Proxy Statement stated the following about Defendant James:

**Dennis James** has served as a Director since May 2021. Mr. James is an accomplished financial executive with over 45 years of banking, accounting, and M&A experience, with both public and private companies. After nine years in public accounting, Mr. James joined Bank OZK in 1981 as its Chief Financial Officer and a member of its board of

directors. In November 1984, he left the Bank to serve as Vice Chairman and Chief Operating Officer of LSI Financial Group. In 2005, James rejoined Bank OZK and moved to the Dallas area to serve as its North Texas Division President, returning to Little Rock, Arkansas in 2012 to direct the Bank's Mergers and Acquisition activities and their Regulatory and Government Relations. James retired from the Bank in February 2022 but remains active on boards of directors and providing executive consulting services to various companies. Throughout his public accounting and executive management career, Mr. James served on boards of a variety of private companies and nonprofits. Mr. James graduated from the University of Arkansas with honors, receiving a Bachelor of Science and Bachelor of Law degree with a major in accounting.

62.     Upon information and belief, Defendant James is a citizen of Arkansas.

**Defendant Laniado**

63.     Defendant Laniado has served as a Company director since February 12, 2021. He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of August 16, 2022, Defendant Laniado beneficially owned 33,456 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on August 16, 2022 was $1.97, Defendant Laniado owned approximately $65,908 worth of RYVYL stock.

64.     For Fiscal Year 2022, Defendant Laniado received approximately $46,565 in total compensation from the Company. This included $32,500 in fees earned or paid in cash and $14,065 in stock awards. For Fiscal Year 2021, Defendant Laniado received approximately $60,000 in total compensation from the Company. This included $2,500 per month in salary and $2,500 per month in stock awards, pursuant to the BOD Agreements.

65.     The 2022 Proxy Statement stated the following about Defendant Laniado:

*Ezra Laniado* has served as a Director since February 2021 and has, since 2018, been Executive Director of the San Diego chapter of Friends of Israel Defence Forces and, since 2017, been Regional Director of the San Diego chapter of the Israeli-American Council, two American charitable organizations providing support and funds for Israel and the Israeli community in America. In such capacity, Mr. Laniado has raised over $5 million in donations and managed over 30 volunteers. From 2014 to 2017, Mr. Laniado was Co-Founder and Business Director of Shonglulu Group, a fashion brand. As Business Director, Mr. Laniado raised capital, coordinated the company's marketing strategy, and implemented its business plan. Prior to 2014, Mr. Laniado was an attorney

in Israel for 4 years. Mr. Laniado received a B.A. and an L.L.B. from the Interdisciplinary Center Herzliya.

66.     Upon information and belief, Defendant Laniado is a citizen of California.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

67.     By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of RYVYL and because of their ability to control the business and corporate affairs of RYVYL, the Individual Defendants owed RYVYL and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage RYVYL in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of RYVYL and its shareholders so as to benefit all shareholders equally.

68.     Each controlling shareholder, director, and officer of the Company owes to RYVYL and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

69.     The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors and/or officers of RYVYL, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

70.     To discharge their duties, the controlling shareholders, officers and directors of RYVYL were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

71.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct

of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of RYVYL, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised RYVYL's Board at all relevant times.

72.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

73.     To discharge their duties, the officers and directors of RYVYL were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of RYVYL were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, California, and the United States, and pursuant to RYVYL's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how RYVYL conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of RYVYL and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that RYVYL's operations would comply with all applicable laws and RYVYL's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

74.     Each of the Individual Defendants further owed to RYVYL and the shareholders the duty of loyalty requiring that each favor RYVYL's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

75.     At all times relevant hereto, the Individual Defendants were the agents of each other and of RYVYL and were at all times acting within the course and scope of such agency.

76.     Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with RYVYL, each of the Individual Defendants had access to adverse, non-public information about the Company.

77.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by RYVYL.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

78.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

79.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, and waste of corporate assets.

80.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of RYVYL was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

81.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

82.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of RYVYL and was at all times acting within the course and scope of such agency.

## RYVYL'S CODE OF CONDUCT

83.     RYVYL's Code of Conduct "helps ensure compliance with legal requirements and our standards of business conduct." The Code of Conduct states the following, in relevant part:

> This Code applies to directors, officers, and employees of RYVYL Inc. (the "Corporation"). Therefore, all directors, officers and employees of the Corporation are expected to read and understand this Code, uphold these standards in day-to-day activities, comply with all applicable policies and procedures, and ensure that all agents and contractors are aware of, understand and adhere to these standards.

84.     In a section titled "Compliance is Everyone's Business," the Code of Conduct states the following:

> Ethical business conduct is critical to the business of the Corporation. Each director, officer or employee has a responsibility is to respect and adhere to these practices. Many of these practices reflect legal or regulatory requirements. Violations of these laws and regulations can create significant liability for the violator, the Corporation, its directors, officers, and other employees.

> Part of the job and ethical responsibility of each director, officer and employee is to help enforce this Code. Each director, officer and employee should be alert to possible violations and report possible violations to the CFO.

> Each director, officer and employee must cooperate in any internal or external investigations of possible violations.

85.     In a subsection within a section titled "Your Responsibilities to the Corporation and its Stockholders," the Code of Conduct states the following:

> ***All Corporate directors, officers, employees, agents, and contractors must comply with all applicable laws, regulations, rules, and regulatory orders.*** Corporate directors, officers and employees located outside of the United States must comply with laws, regulations, rules, and regulatory orders of the United States, including the Foreign Corrupt Practices Act and the U.S. Export Control Act, in addition to applicable local laws. ***Each director, officer, employee, agent, and contractor must acquire appropriate knowledge of the requirements relating to his or her duties sufficient to enable him or her to recognize potential dangers and to know when to seek advice from the CFO on specific Corporate policies and procedures. Violations of laws, regulations, rules, and orders may subject the director, officer, employee, agent or contractor to individual criminal or civil liability, as well as to discipline by the Corporation. Such individual violations may also subject the Corporation to civil or criminal liability or the loss of business.***

(Emphasis added.)

86.     In another section titled "Obligations under Securities Laws- 'Insider Trading'," the Code of Conduct provides that "U.S. securities laws apply to everyone." The Code of Conduct then states the following requirements for officers, directors, and employees:

> In the normal course of business, officers, directors, employees, agents, contractors, and consultants of the Corporation may come into possession of significant, sensitive information. This information is the property of the Corporation, and any director, officer, or employee in possession of such information has been entrusted with it. No director, officer or employee may profit from it by buying or selling securities on their own behalf, or passing on the information to others to enable them to profit or for them to profit on behalf of such director, officer, or employee. The purpose of this policy is both to inform all Corporate employees of the legal responsibilities and to make clear that the misuse of sensitive information is contrary to Corporate policy and U.S. securities laws.
>
> Insider trading is a crime, penalized by fines of up to $5,000,000 and 20 years in jail for individuals. In addition, the SEC may seek the imposition of a civil penalty of up to three times the profits made or losses avoided from the trading. Insider traders must also disgorge any profits made, and are often subjected to an injunction against future violations. Finally, insider traders may be subjected to civil liability in private lawsuits.

87.     In a section titled "Use of Corporation's Assets," the Code of Conduct states the following, in relevant part:

> Protecting the Corporation's assets is a key fiduciary responsibility of every director, officer, employee, agent, and contractor. Care should be taken to ensure that assets are not misappropriated, loaned to others, or sold or donated, without appropriate

authorization. All Corporate directors, officers, employees, agents, and contractors are responsible for the proper use of Corporate assets, and must safeguard such assets against loss, damage, misuse, or theft.

88.     In a subsection titled "Accounting Practices," the Code of Conduct states the following, in relevant part:

The Corporation's responsibilities to its stockholders and the investing public require that all transactions be fully and accurately recorded in the Corporation's books and records in compliance with all applicable laws. False or misleading entries, unrecorded funds or assets, or payments without appropriate supporting documentation and approval are strictly prohibited and violate Corporate policy and the law.

Additionally, all documentation supporting a transaction should fully and accurately describe the nature of the transaction and be processed in a timely fashion.

89.     In a section titled "Government Relations," the Code of Conduct states the following, in relevant part:

It is the Corporation's policy to comply fully with all applicable laws and regulations governing contact and dealings with government employees and public officials, and to **_adhere to high ethical, moral, and legal standards of business conduct_**. **_This policy includes strict compliance with all local, state, federal, foreign, and other applicable laws, rules, and regulations._**

(Emphasis added.)

90.     In another section titled "Disciplinary Actions," the Code of Conduct outlines the following consequences should an officer, employee, and/or director not follow the Code of Conduct:

The matters covered in this Code are of the utmost importance to the Corporation, its stockholders, and its business partners, and are essential to the Corporation's ability to conduct its business in accordance with its stated values. The Corporation expects all its directors, officers, employees, agents, contractors, and consultants to adhere to these rules in carrying out their duties for the Corporation.

The Corporation will take appropriate action against any director, officer, employee, agent, contractor, or consultant whose actions are found to violate these policies or any other policies of the Corporation. Disciplinary actions may include immediate termination of employment or business relationship at the Corporation's sole discretion. Where the Corporation has suffered a loss, it may pursue its remedies against the individuals or entities responsible. Where laws have been violated, the Corporation will cooperate fully with the appropriate authorities.

***Audit Committee Charter***

91.     The RYVYL Audit Committee Charter (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

92.     Per the "Purpose" section of the Audit Committee Charter, the Audit Committee is tasked with the following responsibilities:

> The Audit Committee of the Board of Directors (the "Board") of RYVYL Inc. (the "Corporation") will make such examinations as are necessary to monitor the corporate financial reporting and external audits of the Corporation and its subsidiaries; to provide to the Board the results of its examinations and recommendations derived therefrom; to outline to the Board improvements made, or to be made, in internal accounting controls; to nominate independent auditor; and to provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters requiring Board attention.

93.     Under the section titled, "Audited Financial Statements and Annual Audit," the Audit Committee Charter states that the Audit Committee shall do the following, in relevant part:

- The Audit Committee shall review the overall audit plan (both internal and external) with the independent auditors and the members of management who are responsible for preparing the Company's financial statements, including the Chief Financial Officer…;

- The Audit Committee must review: major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies;

- The Audit Committee must review major issues regarding accounting principles and procedures and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles;

- ***If brought to the attention of the Audit Committee, the Audit Committee shall discuss with the Chief Executive Officer and Chief Financial Officer of the Company**: all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, within the time periods specified in the SEC's rules and forms, and any fraud involving management or other employees who have significant role in the Company's internal control over financial reporting.*

94.     In a section titled "Unaudited Quarterly Financial Statements," the Audit Committee Charter states the following, in relevant part:

> The Audit Committee shall discuss with management and the independent auditors, prior to the filing of the Company's Quarterly Reports on Form 10-Q, (1) the Company's quarterly financial statements and the Company's related disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," (2) such issues as may be brought to the Audit Committee's attention by the independent auditors pursuant to Statement on Auditing Standards No. 100, and (3) ***any significant financial reporting issues that have arisen in connection with the preparation of such financial statements.***

(Emphasis added.)

95.     In a section titled "Risk Assessment and Management," the Audit Committee Charter states the following, in relevant part:

- The Audit Committee shall discuss the guidelines and policies that govern the process by which the Company's exposure to risk is assessed and managed by management.

- In connection with the Audit Committee's discussion of the Company's risk assessment and management guidelines, the Audit Committee may discuss or consider the Company's major financial risk exposures and the steps that the Company's management has taken to monitor and control such exposures.

96.     In a section titled "Regular Reports to the Board," the Audit Committee Charter states the following, in relevant part:

> ***The Audit Committee shall regularly report to and review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements***, the Company's compliance with legal or regulatory requirements, the performance and independence of the independent auditors, the performance of the internal audit function and any other matters that the Audit Committee deems appropriate or is requested to review for the benefit of the Board.

(Emphasis added.)

97.     The Individual Defendants violated the Code of Conduct by engaging in or permitting the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement,

abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and aiding and abetting thereof.   Also in violation of the Code of Conduct, two of the Individual Defendants engaged in insider trading. In further violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

98.     Moreover, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by issuing materially false and misleading statements to the investing public, and by facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act and the Securities Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures and failing to adequately oversee the Company's disclosure controls and procedures.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

99.     Founded as ASAP Expo, Inc., the Company was incorporated in Nevada on April 10, 2007. On June 13, 2017, Defendants Errez and Nisan launched GreenBoxPOS as a private company focused on payment solutions on the blockchain. On April 12, 2018, ASAP Expo, Inc. acquired GreenBox's blockchain gateway and payment system business, among other things. Subsequently, the Company became publicly traded over the counter ("OTC") under the ticker symbol "GRBX" in April 2018 and changed its name to GreenBox on May 3, 2018.

100.     On January 4, 2020, ASAP Expo, Inc. and GreenBox entered into an asset purchase agreement to memorialize a verbal agreement entered on April 12, 2018. Through the asset purchase agreement, the Company acquired a blockchain gateway and payment system business, point of sale

system business, delivery business and kiosk business, bank and merchant accounts, and intellectual property.

101.    The Company continued to seek out additional capital through EF Hutton, formerly known as Kingswood Capital Markets and R.F. Lafferty & Co. (both stock and investment brokerage firms), in early 2021.

102.    Indeed, on January 29, 2021, the Company filed the Registration Statement with the SEC, which Defendants Nisan and Errez signed or authorized the signing of. Approximately two weeks later, on February 17, 2021, the Company commenced the Offering, selling 4,150,000 shares of Company common stock at $10.50 per share. In total, the Offering injected approximately $43.6 million of capital into the Company.

**False and Misleading Statements**

***The Registration Statement***

103.    The Registration Statement, filed with the SEC on January 29, 2021, represented to investors that RYVYL had adequate financial and accounting controls in place at the time of the Offering. The Registration Statement also played down the Company's internal control weaknesses, thus rendering it materially inaccurate. In relevant part, the Registration Statement stated the following:

> Ensuring that we have adequate internal financial and accounting controls and procedures in place so that we can produce accurate financial statements on a timely basis is a costly and time-consuming effort that will need to be evaluated frequently. As of December 31, 2019, the Company's Principal Executive Officer and Principal Financial and Accounting Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures were not effective to provide reasonable assurance that information that it is required to disclose in reports that the Company files with the SEC is recorded, processed, summarized, and reported within the time periods specified by the Exchange Act rules and regulations.

104.    The Prospectus, filed with the SEC on February 18, 2021, contained the same misrepresentations about the adequacy of the Company's internal financial and accounting controls.

105.     The statements in ¶¶ 103-104 above were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) RYVYL's Offering was solicited on false and misleading information; (2) RYVYL did not design sufficient controls to identify and report proper revenue and assets; (3) the Company did not design and implement sufficient internal controls procedures; (4) RYVYL played down the adequacy of the Company's internal controls; (5) as a result, RYVYL would have to restate certain financial statements; and (6) RYVYL failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *2021 Proxy Statement*

106.     On October 18, 2021, the Company filed its proxy statement on Schedule 14A with the SEC (the "2021 Proxy Statement"). Defendants Errez, Nisan, Baer, Caragol, Laniado, James, and nonparty Carl Williams solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

107.     The 2021 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) reelect Defendants Errez, Nisan, Baer, Caragol, Laniado, and James to the Board; (2) ratify the appointment of BF Borgers CPA PC as the Company's independent registered accounting firm for Fiscal Year 2021; (3) approve, via non-binding advisory vote, the named executive officers' compensation; (4) approve the Amended and Restated Articles of Incorporation; (5) approve the Amended and Restated Bylaws; and (6) approve the adoption of GreenBox POS 2021 Restricted Stock Plan (the "Plan").

108.     Pursuant to the Plan, awards may be granted until the seventh anniversary of the Plan's effective date, which is November 18, 2028. The Plan is administered by the Compensation Committee of the Board.  The Plan authorizes 5,000,000 shares of Company common stock for disbursement to

officers, directors, and key employees of the Company to "provide incentives which will attract, retain, motivate, and reward officers, directors, and key employees of us or any of our Affiliates ("Participants"), by providing them opportunities to acquire shares of our common stock." Further, the Plan includes no annual limit for non-employee directors' total compensation.

109.    With respect to the Company's Code of Conduct, the 2021 Proxy Statement stated the following:

> Our Board adopted a Code of Business Conduct and Ethics that applies to our directors, officers, and employees. A copy of this code is available on our website. We intend to disclose on our website any amendments to the Code of Business Conduct and Ethics and any waivers of the Code of Business Conduct and Ethics that apply to our principal executive officer, principal financial officer, principal accounting officer, controller, or persons performing similar functions.

110.    Regarding "Risk Oversight," the 2021 Proxy Statement stated the following:

> Our Board oversees a company-wide approach to risk management. Our Board determines the appropriate risk level for us generally, assess the specific risks faced by us and review the steps taken by management to manage those risks. While our Board will have ultimate oversight responsibility for the risk management process, its committees will oversee risk in certain specified areas.

> Specifically, our Compensation Committee is responsible for overseeing the management of risks relating to our executive compensation plans and arrangements, and the incentives created by the compensation awards it administers. Our Audit Committee oversees management of enterprise risks and financial risks, as well as potential conflicts of interests. Our board of directors are responsible for overseeing the management of risks associated with the independence of our Board.

111.    The 2021 Proxy Statement stated the following regarding the performance-based portion of named executive officer compensation:

> Historically, some of our Executive Officers have been granted shares of our common stock. These stock awards were not subject to any vesting conditions. The stock awards were used as performance incentive and to align our Executive Officers' compensation to the interests of the Company. If approved in this Annual Meeting, we intend to use the Restricted Stock Plan for any future stock grants to our Executive Officers.

112.    The 2021 Proxy Statement was materially misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct and that it

would disclose waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed; (2) contrary to the 2021 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it; and (3) although the Individual Defendants purported to furnish stock grants to executives based upon the performance of the Company, the Company's common stock was artificially inflated as a result of the false and misleading statements.

113.    The 2021 Proxy Statement was also materially misleading because it failed to disclose, *inter alia*, that: (1) RYVYL's Offering was solicited on false and misleading information; (2) RYVYL did not design sufficient controls to identify and report proper revenue and assets; (3) the Company did not design and implement sufficient internal controls procedures; (4) RYVYL played down the adequacy of the Company's internal controls; (5) as a result, RYVYL would have to restate certain financial statements; and (6) RYVYL failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

114.    As a result of Defendants Errez, Nisan, Baer, Caragol, Laniado, and James causing the 2021 Proxy Statement to be false and misleading, RYVYL shareholders voted, *inter alia*, to: (1) reelect Defendants Errez, Nisan, Baer, Caragol, Laniado, and James to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) ratify BF Borgers CPA PC as the Company's independent registered accounting firm for Fiscal Year 2021; (3) approve, via non-binding advisory vote, the named executive officers' compensation; (4) approve the Amended and Restated Articles of Incorporation; (5) approve the Amended and Restated Bylaws; and (6) approve the adoption of the Plan.

### *March 31, 2022 Form 10-K*

115.    On March 31, 2022, the Company filed its annual report on Form 10-K for Fiscal Year 2021 ("2021 10-K") with the SEC. Attached to the 2021 10-K were made certifications pursuant to

Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and Sarbanes-Oxley Act of 2002 ("SOX") and signed by Defendants Nisan and Chung attesting to the accuracy of the 2021 10-K. Defendants Nisan, Errez, Baer, Caragol, and Laniado signed the 2021 10-K.

116.    The 2021 10-K reported $26,304,502 in net revenue and $26,453,512 in net loss. The 2021 10-K further reported $115,690,180 in total assets and $45,505,423 in total stockholders' equity.

117.    Additionally, the 2021 10-K played down the major problems with RYVYL's internal controls, stating the following, in relevant part:

***Controls and Procedures***

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this report. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer has concluded that, ***as of December 31, 2021, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC and (ii) accumulated and communicated to our management, including our principal executive and principal accounting officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.***

***Changes in Internal Control Over Financial Reporting***

There have been ***no changes in our internal controls over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act or in other factors that materially affected or are reasonably likely to materially affect our internal controls and procedures over financial reporting during the fourth quarter of the year ended December 31, 2021.***

(Emphasis added.)

118.    The 2021 10-K was materially false and misleading because it failed to disclose, *inter alia*, that: (1) RYVYL's Offering was solicited on false and misleading information; (2) RYVYL did not design sufficient controls to identify and report proper revenue and assets; (3) the Company did not design and implement sufficient internal controls procedures; (4) RYVYL played down the adequacy of the Company's internal controls; (5) as a result, RYVYL would have to restate certain financial

statements; and (6) RYVYL failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### May 16, 2022 Form 10-Q

119.    On May 16, 2022, the Company filed its financial results on Form 10-Q for the first quarter ending March 31, 2022 ("1Q 2022 10-Q") with the SEC, which Defendants Nisan and Chung signed. Attached to the 1Q 2022 10-Q were certifications made pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX and signed by Defendants Nisan and Chung attesting to the accuracy of the 1Q 2022 10-Q.

120.    The 1Q 2022 10-Q reported $4,895,526 in net revenue and $21,315,987 in net loss for the first three months of 2022, ending March 31, 2022. The 1Q 2022 10-Q further reported $84,350,603 in total assets and $23,361,142 in total stockholders' equity.

121.    The 1Q 2022 10-Q represented that the Company's disclosure controls and procedures were effective as of March 31, 2022, stating the following, in relevant part:

**Controls and Procedures**

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this Quarterly Report on Form 10-Q. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer has concluded that, *as of March 31, 2022, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC and (ii) accumulated and communicated to our management, including our principal executive and principal accounting officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.*

There were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the three months ended March 31, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

122.    The statements in ¶¶ 119-121 above were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) RYVYL's Offering was solicited on false and misleading information; (2) RYVYL did not design sufficient controls to identify and report proper revenue and assets; (3) the Company did not design and implement sufficient internal controls procedures; (4) RYVYL played down the adequacy of the Company's internal controls; (5) as a result, RYVYL would have to restate certain financial statements; and (6) RYVYL failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### *August 15, 2022 Form 10-Q*

123.    On August 15, 2022, the Company filed its financial results on Form 10-Q for the second quarter ending June 30, 2022 ("2Q 2022 10-Q") with the SEC, which Defendants Nisan and Chung signed. Attached to the 2Q 2022 10-Q were certifications made pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX and signed by Defendants Nisan and Chung attesting to the accuracy of the 2Q 2022 10-Q.

124.    The 2Q 2022 10-Q reported $6,965,578 in net revenue for the three months ended June 30, 2022 and $10,905,902 in net revenue for the six months ended June 30, 2022. The 2Q 2022 10-Q also reported $10,410,085 in net loss for the three months ended June 30, 2022 and $10,905,902 in net loss for the six months ended June 30, 2022. The 2Q 2022 10-Q further reported $139,781,295 in total assets and $39,949,337 in total stockholders' equity.

125.    The 2Q 2022 10-Q represented that the Company's disclosure controls and procedures were effective as of June 30, 2022, stating the following, in relevant part:

**Controls and Procedures**

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure

controls and procedures (as defined in Rules 13a-15I and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this Quarterly Report on Form 10-Q. ***Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer has concluded that, as of June 30, 2022, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC and (ii) accumulated and communicated to our management, including our principal executive and principal accounting officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.***

There were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the three and six months ended June 30, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

### *2022 Proxy Statement*

126.    On August 31, 2022, the Company filed its proxy statement on Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Errez, Nisan, Baer, Caragol, Laniado, James, and nonparty N. Adele Hogan solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

127.    The 2022 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) reelect Defendants Errez, Nisan, Baer, Caragol, Laniado, and James to the Board; (2) ratify the appointment of Simon & Edward, LLP as the Company's independent registered public accounting firm Fiscal Year 2022; (3) approve, via non-binding advisory vote, the named executive officers' compensation; (4) approve the Amended and Restated Articles of Incorporation; and (5) approve the Amended and Restated Bylaws.

128.    With respect to the Company's Code of Conduct, the 2022 Proxy Statement stated the following:

Our Board adopted a Code of Business Conduct and Ethics that applies to our directors, officers, and employees. A copy of this code is available on our website. We intend to disclose on our website any amendments to the Code of Business Conduct and Ethics and

any waivers of the Code of Business Conduct and Ethics that apply to our principal executive officer, principal financial officer, principal accounting officer, controller, or persons performing similar functions.

129.    Regarding "Risk Oversight," the 2022 Proxy Statement stated the following:

Our Board oversees a company-wide approach to risk management. Our Board determines the appropriate risk level for us generally, assess the specific risks faced by us and review the steps taken by management to manage those risks. While our Board will have ultimate oversight responsibility for the risk management process, its committees will oversee risk in certain specified areas.

Specifically, our Compensation Committee is responsible for overseeing the management of risks relating to our executive compensation plans and arrangements, and the incentives created by the compensation awards it administers. Our Audit Committee oversees management of enterprise risks and financial risks, as well as potential conflicts of interests. Our board of directors are responsible for overseeing the management of risks associated with the independence of our Board.

130.    The 2022 Proxy Statement stated the following regarding the performance-based portion of named executive officer compensation:

Our executive compensation program includes equity awards for equity interests in the Company granted under the 2020 Stock Option Plan and 2021 Stock Option Plan. Consistent with our compensation philosophy, we have emphasized the use of equity to incentivize our Executive Officers to focus on the growth of our overall enterprise value and, correspondingly, the creation of value for our equity holders. We consider equity-based compensation a significant motivator in encouraging executives to come, stay, grow, and lead.

131.    The 2022 Proxy Statement was materially misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed; (2) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it; and (3) although the Individual Defendants purported to furnish stock grants to executives based upon the performance of the Company, the Company's common stock was artificially inflated as a result of the false and misleading statements.

132.    The 2022 Proxy Statement was also materially misleading because it failed to disclose, *inter alia*, that: (1) RYVYL's Offering was solicited on false and misleading information; (2) RYVYL did not design sufficient controls to identify and report proper revenue and assets; (3) the Company did not design and implement sufficient internal controls procedures; (4) RYVYL played down the adequacy of the Company's internal controls; (5) as a result, RYVYL would have to restate certain financial statements; and (6) RYVYL failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

133.    As a result of Defendants Errez, Nisan, Baer, Caragol, Laniado, and James causing the 2022 Proxy Statement to be false and misleading, RYVYL shareholders voted, *inter alia*, to: (1) reelect Defendants Errez, Nisan, Baer, Caragol, Laniado, and James to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) ratify Simon & Edward, LLP as the Company's independent registered public accounting firm for Fiscal Year 2022; (3) approve, via non-binding advisory vote, the named executive officers' compensation; (4) approve the Amended and Restated Articles of Incorporation; and (5) approve the Amended and Restated Bylaws.

***November 21, 2022 Form 10-Q***

134.    On November 21, 2022, the Company filed its financial results on Form 10-Q for the third quarter ending September 30, 2022 ("3Q 2022 10-Q") with the SEC, which Defendants Nisan and Byelick signed. Attached to the 3Q 2022 10-Q were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX certifications signed by Defendants Nisan and Byelick attesting to the accuracy of the 3Q 2022 10-Q.

135.    The 3Q 2022 10-Q reported $10,629,691 in net revenue for the three months ended September 30, 2022 and $22,490,824 in net revenue for the nine months ended September 30, 2022. The 3Q 2022 10-Q also reported $15,170,277 in net loss for the three months ended September 30, 2022 and

$26,076,181 in net loss for the nine months ended September 30, 2022. The 3Q 2022 10-Q further reported $122,401,080 in total assets and $34,705,946 in total stockholders' equity.

136.    The 3Q 2022 10-Q represented that the Company's disclosure controls and procedures were effective as of September 30, 2022, stating the following, in relevant part:

**Controls and Procedures**

Our management has evaluated, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of the end of the period covered by this Quarterly Report on Form 10-Q. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer has concluded that, ***as of September 30, 2022, our disclosure controls and procedures were effective in ensuring that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is (i) recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC and (ii) accumulated and communicated to our management, including our principal executive and principal accounting officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.***

There were no changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) that occurred during the three and nine months ended September 30, 2022, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

137.    The statements in ¶¶ 123-125 and 134-136 above were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) RYVYL's Offering was solicited on false and misleading information; (2) RYVYL did not design sufficient controls to identify and report proper revenue and assets; (3) the Company did not design and implement sufficient internal controls procedures; (4) RYVYL played down the adequacy of the Company's internal controls; (5) as a result, RYVYL would have to restate certain financial statements; and (6) RYVYL failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

*January 20, 2023 Form 8-K*

138.    On January 20, 2023, RYVYL filed a Form 8-K with the SEC, revealing to the investing public that the Company's previously issued financial statements as of December 31, 2021, for the year ended December 31, 2021, as of and for the periods within the year ended December 31, 2021, and as of and for the periods ended September 30, June 30, and March 31, 2022 should no longer be relied upon and needed to be restated. The Form 8-K also revealed that RYVYL suffered from additional internal control deficiencies and identified a remediation plan, stating the following, in relevant part:

> Based on discussions between the audit committee (the "Audit Committee") of the board of directors of RYVYL Inc. (the "Company") and the Company's new independent registered public accounting firm, Simon & Edward, LLP ("Simon & Edward"), *the Company concluded on January 13, 2023 that the Company's previously issued financial statements as of December 31, 2021, for the year ended December 31, 2021, as of and for the interim periods within the year ended December 31, 2021 and as of and for the interim periods ended September 30, June 30 and March 31, 2022 (collectively the "Previously Issued Financial Statements"), and the related audit report of the Company's previous independent registered public accounting firm, BF Borgers CPA, PC, can no longer be relied upon. It is expected that the restatement of the financial statements for the annual and interim periods referred to above will result in decreases to total revenue, increased net losses, decreases to total assets, and decreased total stockholders' equity.*
>
> *The Audit Committee of the Company and its management concluded that the Company's Previously Issued Financial Statements should be restated to correct the aforementioned financial statements and that, accordingly, such Previously Issued Financial Statements should no longer be relied upon to that extent.* Related press releases, investor presentations or other communications describing the Company's financial statements for these periods should no longer be relied upon to that extent.
>
> The Company anticipates filing the restatements of the Previously Issued Financial Statements as soon as practicable. The Company plans on filing the restated financial statements in its Annual Report on Form 10-K for the year ended December 31, 2022 and in any other filings that may be necessary or appropriate.
>
> *In connection with such restatements, the Company has reassessed its conclusions regarding the effectiveness of the Company's internal control over financial reporting as of December 31, 2021 and has determined that one or more material weaknesses exist in the Company's internal control including a material weakness related to accounting for certain complex business transactions. The Company expects to report one or more material weaknesses as of December 31, 2021, as well as its related*

*remediation efforts including having engaged, as of August 2022, third party technical accounting experts to support proper accounting for complex accounting transactions. As a result of the material weakness, the Company's management concluded its disclosure controls and procedures were not effective as of December 31, 2021, and September 30, June 30, and March 31, 2022.*

The Company's management and the Audit Committee have discussed the matters described herein with Simon & Edward.

(Emphasis added.)

139.    On this news, RYVYL's stock fell $0.12 per share, or 14.63%, from closing at $0.82 per share on January 20, 2023 to close at $0.70 per share on January 23, 2023 on usually heavy trading volume.

### **Insider Sales**

140.    Defendants Errez and Chung made insider sales, detailed above, at prices artificially inflated by the false and misleading statements at issue for collective proceeds of $388,000.

141.    Those sales that occurred shortly before or after the Individual Defendants caused the Company to issue false and misleading statements contribute to an inference that these Individual Defendants knew of the falsity of the statements and were cashing in while the Company's common stock continued to trade at artificially inflated prices.

142.    For instance, Defendant Errez sold 192,000 common shares on February 12, 2021, just days after the Company filed its Registration Statement and just days before the Company filed its Prospectus, both of which contained false and misleading statements.

143.    Defendant Chung sold 40,000 of his Company shares on February 3, 2022 for a profit of $138,400 before the Company's annual report filing on Form 10-K in March 2022, which contained false and misleading statements.

144.    The timing and amounts of these insider sales, made while the price of the Company's common stock was artificially inflated, further demonstrate that the Individual Defendants, including those who served on the Board, knew of the falsity of the statements made and that those Individual

Defendants who made insider sales were using this knowledge to enrich themselves while the Company's common stock remained inflated.

**Repurchases During the Relevant Period**

145.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $14,346,785 to repurchase at least 3,098,586 shares of its own common stock at artificially inflated prices from May 2021 through December 2022.[1]

146.     According to the Form 10-Q the Company filed with the SEC on November 15, 2021 for the quarterly period ended September 30, 2021 (the "3Q 2021 10-Q"), between May 13, 2021 and May 31, 2021, the Company purchased 70,000 shares of its common stock for approximately $692,300 at an average price of $9.89 per share.

147.     As the Company's stock was actually worth only $0.70 per share, the price at closing on January 23, 2023, the Company overpaid by approximately $643,300 for repurchases of its own stock between May 13, 2021 and May 31, 2021.

148.     According to the 3Q 2021 10-Q, between June 1, 2021 and June 30, 2021, the Company purchased 20,000 shares of its common stock for approximately $232,400 at an average price of $11.62 per share.

149.     As the Company's stock was actually worth only $0.70 per share, the price at closing on January 23, 2023, the Company overpaid by approximately $218,400 for repurchases of its own stock between June 1, 2021 and June 30, 2021.

---

[1] According to the 2022 10-K, "from May 13, 2021 to December 31, 2022," the Individual Defendants caused the Company to repurchase "a total of 3,098,586 shares at an aggregate cost of $14,346,785." These amounts "include two related party transactions in which the Company repurchased 2 million shares of common stock held by PrivCo."

150.    According to the 3Q 2021 10-Q, between July 1, 2021 and July 31, 2021, the Company purchased 2,500 shares of its common stock for approximately $26,375 at an average price of $10.55 per share.

151.    As the Company's stock was actually worth only $0.70 per share, the price at closing on January 23, 2023, the Company overpaid by approximately $24,625 for repurchases of its own stock between July 1, 2021 and July 31, 2021.

152.    According to the 3Q 2021 10-Q, between August 1, 2021 and August 31, 2021, the Company purchased 167,500 shares of its common stock for approximately $1,350,050 at an average price of $8.06 per share.

153.    As the Company's stock was actually worth only $0.70 per share, the price at closing on January 23, 2023, the Company overpaid by approximately $1,232,800 for repurchases of its own stock between August 1, 2021 and August 31, 2021.

154.    According to the 3Q 2021 10-Q, between September 1, 2021 and September 30, 2021, the Company purchased 40,000 shares of its common stock for approximately $380,000 at an average price of $9.50 per share.

155.    As the Company's stock was actually worth only $0.70 per share, the price at closing on January 23, 2023, the Company overpaid by approximately $352,000 for repurchases of its own stock between September 1, 2021 and September 30, 2021.

156.    According to the 2021 10-K, between November 1, 2021 and November 30, 2021, the Company purchased 364,831 shares of its common stock for approximately $2,002,922 at an average price of $5.49 per share.

157.    As the Company's stock was actually worth only $0.70 per share, the price at closing on January 23, 2023, the Company overpaid by approximately $1,747,541 for repurchases of its own stock between November 1, 2021 and November 30, 2021.

158.    According to the 2021 10-K, between December 1, 2021 and December 31, 2021, the Company purchased 50,000 shares of its common stock for approximately $251,000 at an average price of $5.02 per share.

159.    As the Company's stock was actually worth only $0.70 per share, the price at closing on January 23, 2023, the Company overpaid by approximately $216,000 for repurchases of its own stock between December 1, 2021 and December 31, 2021.

160.    According to the 1Q 2022 10-Q, between January 1, 2022 and January 31, 2022, the Company purchased 683,755 shares of its common stock for approximately $3,001,684 at an average price of $4.39 per share.

161.    As the Company's stock was actually worth only $0.70 per share, the price at closing on January 23, 2023, the Company overpaid by approximately $2,523,055 for repurchases of its own stock between January 1, 2022 and January 31, 2022.

162.    Moreover, during the Relevant Period, Defendants Errez and Nisan, controlling shareholders of the Company who also served on the Company's Board during the Relevant Period, pushed through two related party transactions which directly benefitted each of them at the expense of the Company. Specifically, the related party transactions involved RYVYL repurchasing two million shares of common stock from PrivCo, a company owned and controlled by Defendants Errez and Nisan, in two separate repurchases at artificially inflated prices of $5.59 and $0.82 per share, respectively, during the Relevant Period.

163.    The board "unanimously ratified" the two transactions between RYVYL and PrivCo in October 2022. The First Transaction involved the Company repurchasing 1,000,000 shares for a price per share of $5.59, which was the price of the Company's stock on November 24, 2021, almost one year before the Board ratified the First Transaction. The First Transaction took place over multiple months, from February 2022 to October 2022. However, by the time the Board "unanimously ratified" the First

Transaction in October 2022, RYVYL's common stock was consistently trading for less than one dollar per share. Thus, in total, the Company paid $5,590,000 to repurchase 1,000,000 shares of its common stock at an average price of $5.59 per share through the First Transaction.

164.    As the Company's stock price was actually only worth $0.70 per share, the price at the close of trading on January 23, 2023, the Company should have paid only $700,000 to repurchase its common stock and, thus, overpaid by approximately $4,890,000 to repurchase its common stock in the First Transaction.

165.    The Second Transaction involved the Company repurchasing an additional 1,000,000 shares for a price per share of $0.82, which was the price of the Company's stock on July 29, 2022, almost three months before the Board ratified the Second Transaction. The Second Transaction took place in October 2022. Thus, in total, the Company paid $820,000 to repurchase 1,000,000 shares of its common stock at an average price of $0.82 per share through the Second Transaction.

166.    As the Company's stock price was actually only worth $0.70 per share, the price at the close of trading on January 23, 2023, the Company should have paid only $700,000 to repurchase its common stock and, thus, overpaid by approximately $120,000 to repurchase its common stock in the Second Transaction.

167.    In total, from the Overpayment Misconduct, which consists of both the First and Second Transactions, the Individual Defendants caused RYVYL to spend approximately $6,410,000 to repurchase 2,000,000 shares of its own stock from Defendants and controlling shareholders Errez and Nisan at the Company's expense during the Relevant Period. Through the Overpayment Misconduct, the Company overpaid (and Defendants Errez and Nisan, consequently, were unjustly enriched) by approximately $5 million for repurchases of Company common stock during the Relevant Period.

168.    The Overpayment Misconduct caused issues for the Company internally. Indeed, soon after the conclusion of the Relevant Period, on April 12, 2023, Defendants Caragol and James, along

with non-party director Hogan, resigned from the Board effective immediately due to "a disagreement with the Company, known to Messrs. Errez and Nisan, involving the PrivCo related party transaction."

169.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $3.93 more than the actual worth of each share during the Relevant Period. Thus, the total over payment by the Company for its repurchases of its own stock during the Relevant Period was approximately $12.1 million (i.e., ~$5 million from the Overpayment Misconduct and ~$7.1 million from the additional repurchases made throughout the Relevant Period).

## DAMAGES TO RYVYL

170.    As a direct and proximate result of the Individual Defendants' conduct, RYVYL has lost and expended, and will lose and expend, many millions of dollars.

171.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, CFO, former CFO, and two Board members, the cost of restating certain false and inaccurate SEC filings, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

172.    Additionally, these expenditures include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including stock benefits tied to the Company's attainment of certain objectives and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including the Overpayment Misconduct, which unjustly enriched Defendants Nisan and Errez by over $6,000,000 at the Company's expense.

173.    As a direct and proximate result of the Individual Defendants' conduct, RYVYL has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the

Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement.

## DERIVATIVE ALLEGATIONS

174.    Plaintiff brings this action derivatively and for the benefit of RYVYL to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors and/or officers of RYVYL, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, and violations of the Exchange Act and Securities Act, as well as the aiding and abetting thereof.

175.    RYVYL is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

176.    Plaintiff is, and has continuously been at all relevant times, a shareholder of RYVYL. Plaintiff will adequately and fairly represent the interests of RYVYL in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

177.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

178.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing of this action, the Board consisted of Defendants Errez, Nisan, Laniado, and Baer (the "Director-Defendants") and non-party David S. Montoya (collectively, the "Directors"). Plaintiff needs only to allege demand futility as to three of the five Directors that were on the Board at the time this action was commenced.

179.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts while causing RYVYL to spend over $14 million to repurchase its own stock at artificially inflated prices. As part of the repurchases, the Director-Defendants ratified the Overpayment Misconduct which caused the Company to repurchase two million shares at artificially inflated prices from PrivCo while simultaneously unjustly enriching two of the Director-Defendants and controlling shareholders to the tune of $6.4 million. This renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

180.     Moreover, each of the Director-Defendants, that is, Errez, Nisan, Laniado, and Baer solicited the 2021 Proxy Statement to call for a shareholder vote to, *inter alia*, elect all of them to the Board, thus allowing them to continue breaching their fiduciary duties to RYVYL and to approve the Plan. The misrepresentations and omissions set forth herein were material to shareholders in voting on approval of the Plan who would not have approved the Plan had they been informed about the wrongdoing alleged herein. Under the Plan, the Company grants restricted stock awards and performance stock awards to executive officers, non-employee directors and other key employees of the Company. For Fiscal Year 2021, the Company dispersed $1,776,750 pursuant to the Plan, and for the nine months ended September 30, 2022, the Company dispersed $2,089,500 pursuant to the Plan.

181.     Demand is also excused as to each of the Directors in regard to Plaintiff's Section 14(a) claim specifically because all of the Directors received material personal benefits as a result of shareholders voting to approve the Plan who would not have approved the Plan had they known about the Individual Defendants' misconduct as alleged herein. Indeed, pursuant to the Plan, the Company

made available 5,000,000 more shares for disbursement to non-employee directors and executive officers.

182.    Demand on the Board is also futile due to a series of related party transactions entered into between the Company and various Directors. For example, during the Relevant Period, the Company spent approximately $6.4 million to repurchase 2,000,000 shares of its common stock from PrivCo, a company controlled by Defendants Nisan and Errez, which made up the Overpayment Misconduct. The history of business between the two companies renders Defendants Nisan and Errez unable to disinterestedly and independently consider commencing litigation against themselves and the other Individual Defendants that provide their company with additional business. This history also makes demand on the rest of the Board futile since they are beholden to Defendants Nisan and Errez. Indeed, this beholdenness to Defendants Errez and Nisan is further indicated by the fact that three of the Company's directors resigned from the Board as a result of their disagreement with the PrivCo transactions.

183.    Defendants Baer and Laniado (the "Compensation Committee Directors") served as members of the Compensation Committee during the Relevant Period. The Compensation Committee Directors solicited shareholder approval of the Plan, which granted them the right to determine how many shares of Company common stock to administer under the Plan to non-employee directors, including themselves. They all stood to benefit from, and did benefit from, shareholder approval of the Plan, which Company shareholders were deceived into approving while the Individual Defendants made false and misleading statements pertaining to the wrongdoing alleged herein. Thus, Directors Errez, Nisan, and Montoya are beholden to the Compensation Committee Directors, and the Compensation Committee Directors are beholden to each other, because they would not take action against the very directors who held the authority to raise their total annual compensation pursuant to the Plan. These conflicts of interest precluded the Compensation Committee Directors and the rest of the Directors from

calling into question the Director-Defendants and other Individual Defendants' conduct. Thus, demand upon the Compensation Committee Directors would be futile.

184.    Moreover, each of the Director-Defendants, that is, Errez, Nisan, Laniado, and Baer solicited the 2022 Proxy Statement to call for a shareholder vote to, *inter alia*, reelect each of them to the Board, thus allowing them to continue breaching their fiduciary duties to RYVYL.

185.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements and to participate in the Overpayment Misconduct alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors and to improperly benefit Director-Defendants Errez and Nisan. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

186.    Additional reasons that demand on Defendant Errez is futile follow. Defendant Errez co-founded the Company and has served as the Company's Chairman of the Board, Executive Vice President, Principal Accounting Officer, and as a Company director since July 2017. Thus, as the Company admits, he is a non-independent director. The Company also provides Defendant Errez with his principal occupation for which he is handsomely paid. Defendant Errez was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing public statements, including the Registration Statement, the 2021 10-K, and the 2021 and 2022 Proxy Statements, which he solicited. As one of the Company's top executive officers who holds multiple executive positions and as the trusted Company Chairman of the Board, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sale before

the fraud was exposed, which coincided with him and the Company making false and misleading statements, yielded approximately $249,600 in proceeds and demonstrates his motive in facilitating and participating in the fraud. Defendant Errez also improperly benefitted from the Overpayment Misconduct, which he caused, because he was a controlling shareholder of PrivCo and, thus, received personal benefits by extension of this relationship when PrivCo was unjustly enriched at the expense of the Company through the Overpayment Misconduct.. Moreover, Defendant Errez is a defendant in the Securities Class Action. For these reasons, too, Defendant Errez breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

187.    Additional reasons that demand on Defendant Nisan is futile follow. Defendant Nisan co-founded the Company and has served as the Company's CEO and as a Company director since August 2017. Thus, as the Company admits, he is a non-independent director. The Company also provides Defendant Nisan with his principal occupation for which he is handsomely paid. Defendant Nisan was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing public statements, most of which he personally made statements in, including the Registration Statement, the 2021 10-K, which he signed, and the 2021 and 2022 Proxy Statements, which he solicited. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Nisan also improperly benefitted from the Overpayment Misconduct, which he caused, because he was a controlling shareholder of PrivCo and, thus, received personal benefits by extension of this relationship when PrivCo was unjustly enriched at the expense of the Company through the Overpayment Misconduct. Moreover, Defendant Nisan is a defendant in the Securities Class Action. For

these reasons, too, Defendant Nisan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

188.  Additional reasons that demand on Defendant Baer is futile follow. Defendant Baer has served as a Company director since February 2021. She also serves as a member of the Compensation Committee and as member of the Nominating and Corporate Governance Committee. Defendant Baer has received and continues to receive compensation for her role as a director as described above. Defendant Baer is personally responsible for the false and misleading statements contained in the Registration Statement, the 2021 10-K, and the 2021 and 2022 Proxy Statements, which she solicited. As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and to participate in the Overpayment Misconduct, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, too, Defendant Baer breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

189.  Additional reasons that demand on Defendant Laniado is futile follow. Defendant Laniado has served as a Company director since February 2021. He also serves as a member of the Audit Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Laniado has received and continues to receive compensation for his role as a director as described above. Defendant Laniado is personally responsible for the false and misleading statements contained in the Registration Statement, the 2021 10-K, and the 2021 and 2022 Proxy Statements, which he solicited. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and to participate in the Overpayment Misconduct, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too,

Defendant Laniado breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

190.    Additional reasons that demand on the Board is futile follow.

191.    Moreover, as described above, Individual Defendant Errez directly engaged in insider trading, in violation of federal law. While in possession of material, non-public information, Director-Defendant Errez received proceeds in excess of $249,000 as a result of an insider transaction executed during the period when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Defendant Errez's insider sale seemingly coincided with the Company making false and misleading statements. Therefore, demand in this case is futile as to Defendant Errez, and further excused.

192.    Demand in this case is further excused because Defendants Baer, Laniado, and non-party Montoya are beholden to and controlled by Defendants Errez and Nisan, who are both primary interested wrongdoers who were controlling shareholders during the Relevant Period. Indeed, through their shared ownership of GreenBox POS, LLC, Defendants Errez and Nisan collectively own approximately 37% of the Company's outstanding stock. Additionally, Defendants Errez and Nisan refer to themselves as "life brothers," co-founded RYVYL, and control the management of the Company through their respective positions of CEO, Executive Vice President, Principal Financial Officer, and Principal Accounting Officer. In light of this control, Defendants Baer, Laniado, and non-party Montoya cannot impartially consider a demand against Defendants Errez and Nisan, who are interested, primary wrongdoers, as they are dependent on them for their continued employment with the Company and the compensation that goes with that. Thus, Defendants Baer, Caragol, Laniado, and James are unable to evaluate a demand with disinterest or independence given Defendant Errez's and Defendant Nisan's control over them.

193.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and its shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

194.    Further still, Errez, Nisan, Baer, and Laniado approved the Company's Registration Statement in connection with the Offering of its common stock to investors at prices artificially inflated by their own misconduct. This breach of fiduciary duties has subjected the Company, and certain of the Individual Defendants, to a substantial likelihood of liability in the Securities Class Action by violating the Exchange Act. Therefore, demand in this case is futile as to them, and further excused.

195.    Defendant Laniado served on the Company's Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, Defendant Laniado was responsible for overseeing, *inter alia*, the Company's accounting and financial reporting processes, the integrity of the Company's financial statements and reports, and the adequacy of the Company's internal controls over financial reporting. Defendant Laniado failed to ensure the integrity of the Company's financial statements and internal controls, as he was charged to do under the Audit Committee Charter, allowing the Company to engage in improper accounting methods and to file false and misleading financial statements with the SEC. Thus, Defendant Laniado breached his fiduciary duties, is not disinterested, and demand is excused as to him.

196.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to participate in the Overpayment Misconduct, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross

mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Code of Conduct, the Director-Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, or conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

197.    RYVYL has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for RYVYL any part of the damages RYVYL suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

198.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

199.    The acts complained of herein constitute violations of fiduciary duties owed by RYVYL's officers and directors, and these acts are incapable of ratification.

200.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of RYVYL. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought

directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of RYVYL, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

201. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause RYVYL to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

202. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Defendants Errez, Nisan, Baer, Caragol, Laniado, and James for Violations of Section 14(a) of the Exchange Act**

203. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

204. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

205.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

206.    Under the direction and watch of Defendants Errez, Nisan, Baer, Caragol, Laniado, and James, the 2021 Proxy Statement failed to disclose that: (1) RYVYL's Offering was solicited on false and misleading information; (2) RYVYL did not design sufficient controls to identify and report proper revenue and assets; (3) the Company did not design and implement sufficient internal controls procedures; (4) RYVYL played down the adequacy of the Company's internal controls; (5) as a result, RYVYL would have to restate certain financial statements; and (6) RYVYL failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

207.    Defendants Errez, Nisan, Baer, Caragol, Laniado, and James also caused the 2021 Proxy Statement to be false and misleading by failing to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed; and (2) contrary to the 2021 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it.

208.    In the exercise of reasonable care, Defendants Errez, Nisan, Baer, Caragol, Laniado, and James should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for

shareholder determination in the 2021 Proxy Statement, including the election of directors, the ratification of BF Borgers CPA PC as the Company's independent registered public accounting firm for Fiscal Year 2021, the approval, by non-binding advisory vote, of the name executive officers' compensation, the approval of the Amended and Restated Articles of Incorporation, the approval of the Amended and Restated Bylaws, and the approval of the adoption of the Plan.

209. The false and misleading elements of the 2021 Proxy Statement led Company shareholders to, *inter alia*: (1) reelect Errez, Nisan, Baer, Caragol, Laniado, and James to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) ratify BF Borgers CPA PC as the Company's independent registered public accounting firm for Fiscal Year 2021; (3) approve, via non-binding advisory vote, the named executive officers' compensation; (4) approve the Amended and Restated Articles of Incorporation; (5) approve the Amended and Restated Bylaws; and (6) approve the adoption of the Plan.

210. The Company was damaged as a result of Defendants Errez, Nisan, Baer, Caragol, Laniado, and James's material misrepresentations and omissions in the 2021 Proxy Statement.

211. Under the direction and watch of Defendants Errez, Nisan, Baer, Caragol, Laniado, and James, the 2022 Proxy Statement failed to disclose that: (1) RYVYL's Offering was solicited on false and misleading information; (2) RYVYL did not design sufficient controls to identify and report proper revenue and assets; (3) the Company did not design and implement sufficient internal controls procedures; (4) RYVYL played down the adequacy of the Company's internal controls; (5) as a result, RYVYL would have to restate certain financial statements; and (6) RYVYL failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

212. Defendants Errez, Nisan, Baer, Caragol, Laniado, and James also caused the 2022 Proxy Statement to be false and misleading by failing to disclose that: (1) though the Company claimed its

officers and directors adhered to the Code of Conduct and that it would disclose waivers of the policy, the Individual Defendants violated the Code of Conduct either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it.

213.    In the exercise of reasonable care, Defendants Errez, Nisan, Baer, Caragol, Laniado, and James should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including the election of directors, the ratification of Simon & Edward, LLP as the Company's independent registered accounting firm for the fiscal year ending December 31, 2022, the approval, by non-binding advisory vote, of the name executive officers' compensation, the approval of the Amended and Restated Articles of Incorporation, and the approval of the Amended and Restated Bylaws.

214.    The false and misleading elements of the 2022 Proxy Statement, led Company shareholders to, *inter alia*: reelect Defendants Errez, Nisan, Baer, Caragol, Laniado, and James to the Board, thus allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of Simon & Edward, LLP as the Company's independent registered accounting firm for the fiscal year ending December 31, 2022; (3) approve, via non-binding advisory vote, the named executive officers' compensation; (4) approve the Amended and Restated Articles of Incorporation; and (5) approve the Amended and Restated Bylaws.

215.    The Company was damaged as a result of Defendant's Errez, Nisan, Baer, Caragol, Laniado, and James's material misrepresentations and omissions in the 2022 Proxy Statement.

216.    Plaintiff on behalf of RYVYL has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

217.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

218.   The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding RYVYL. Not only is RYVYL now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon RYVYL by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase over three million of its own shares on the open market at artificially inflated prices, damaging RYVYL by millions of dollars.

219.   During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

220.   The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about RYVYL not misleading.

221.   The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the

conduct complained of herein and the content of the public statements disseminated by RYVYL. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

222.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executives and/or directors of the Company, as members of the Board, the Individual Defendants then serving as directors signed the Company's false and misleading statements filed with the SEC during the Relevant Period, including the Registration Statement, which Defendants Nisan and Errez signed, and the 2021 10-K, which Defendant Nisan signed.

223.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

224.    Plaintiff on behalf of RYVYL has no adequate remedy at law.

### **THIRD CLAIM**

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

225.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

226.    The Individual Defendants, by virtue of their positions with RYVYL and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of RYVYL within the meaning of Section 20 (a) of the Exchange Act. The Individual Defendants had the power and influence and

exercised the same to cause the Defendants to engage in the illegal conduct and practices complained of herein.

## FOURTH CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

227.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

228.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of RYVYL's business and affairs.

229.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

230.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of RYVYL.

231.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

232.    In further breach of their fiduciary duties owed to RYVYL, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) RYVYL's Offering was solicited on false and misleading information; (2) RYVYL did not design sufficient controls to identify and report proper revenue and assets; (3) the Company did not design and implement sufficient internal controls procedures; (4) RYVYL played down the adequacy of the Company's internal controls; (5) as a result, RYVYL would have to restate certain financial statements; and (6) RYVYL failed to maintain internal

controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

233.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

234.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

235.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

236.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

237.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, RYVYL has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

238.    Plaintiff on behalf of RYVYL has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

239.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

240.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, RYVYL.

241.    The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, repurchases, or similar compensation from RYVYL that was tied to the performance or artificially inflated valuation of RYVYL or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

242.    Plaintiff, as a shareholder and a representative of RYVYL, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

243.    Plaintiff on behalf of RYVYL has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

244.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

245.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company.

246.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

247.    Plaintiff on behalf of RYVYL has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Abuse of Control

248.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

249.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence RYVYL, for which they are legally responsible.

250.    As a direct and proximate result of the Individual Defendants' abuse of control, RYVYL has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, RYVYL has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

251.    Plaintiff on behalf of RYVYL has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Gross Mismanagement

252.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

253.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of RYVYL in a manner consistent with the operations of a publicly-held corporation.

254.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, RYVYL has sustained and will continue to sustain significant damages.

255.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

256.    Plaintiff on behalf of RYVYL has no adequate remedy at law.

## NINTH CLAIM

**Against Defendants Errez, Nisan, Byelick, and Chung for Contribution Under Section 11(f) of the Securities Act and 21D of the Exchange Act**

257.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

258.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of RYVYL shareholders, in which it is a joint tortfeasor in claims brought under Sections 11 and 15 of the Securities Act.

259.    Federal law provides RYVYL with a cause of action against other alleged joint tortfeasors under Section 11(f) of the Securities Act.

260.    The plaintiffs in the Securities Class Action allege that the Registration Statement issued in connection with the Company's Offering contained untrue statements of material facts or omitted to

state other facts necessary to make the statements made not misleading and omitted to state material facts required to be stated therein.

261.    RYVYL is the registrant for the Offering. Defendants Errez, Nisan, Byelick, and Chung were responsible for the contents and dissemination of the Registration Statement.

262.    As issuer of the shares, RYVYL is strictly liable to the class action plaintiffs and the class for the misstatements and omissions.

263.    The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and other subsequent public filings were true and without omissions of any material facts and were not misleading.

264.    Defendants Errez, Nisan, Byelick, and Chung, because of their positions of control and authority as controlling shareholders, officers and/or directors of RYVYL, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of RYVYL, including the wrongful acts complained of herein and in the Securities Class Action.

265.    Accordingly, Defendants Errez, Nisan, Byelick, and Chung are liable under Section 11(f) of the Securities Act, 15 U.S.C. § 77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

266.    As such, RYVYL is entitled to receive all appropriate contribution or indemnification from Defendants Errez, Nisan, Byelick, and Chung.

## **PRAYER FOR RELIEF**

267.    FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of RYVYL, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to RYVYL;

(c)     Determining and awarding to RYVYL the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing RYVYL and the Individual Defendants to take all necessary actions to reform and improve RYVYL's corporate governance and internal procedures to comply with applicable laws and to protect RYVYL and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of RYVYL to nominate at least three candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding RYVYL restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: June 22, 2023

Respectfully submitted,

*/s/ Robert C. Moest*
**THE BROWN LAW FIRM, P.C.**
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

Verified Shareholder Derivative Complaint

## VERIFICATION

I, Christy Hertel, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of _6/9/2023_, 2023.

DocuSigned by:

*Christy Hertel*

20E1CA9CDBA347F...